## SLATTER v. OREGON SHORT LINE RAILROAD COMPANY.

No. 2231.   Decided September 7, 1911.   Rehearing Denied, November 11, 1911 (118 Pac. 831).

1. CARRIERS—ACTIONS—SUFFICIENCY OF EVIDENCE—SETTING DOWN PASSENGER BEFORE STATION. Evidence, in an action for being wrongfully and negligently ordered off a train and put off at a place not a station, and before her destination was reached, *held*, sufficient to sustain a verdict for plaintiff. (Page 597.)

2. CARRIERS—ACTION—INSTRUCTIONS—CONFORMITY TO PLEADINGS AND ISSUES. Where the complaint, in an action against a carrier, averred the purchase of a ticket entitling plaintiff to ride between certain points, that her ticket was taken on the train, and that before the train reached her destination the defendant refused to carry her further, and stopped the train at a place other than a station, and in a rude manner ordered her off the train, and upon her refusal, with reckless disregard of the rights, health, and safety of the plaintiff and her two children, wrongfully put them and their baggage from the train, well knowing that the plaintiff was an invalid, and there was evidence in support of such allegations, instructions submitting the case on the theory of whether the plaintiff, "before reaching her station, was caused to alight from the train" by defendant's agents, as she claimed, whether she was a passenger, as alleged, and whether, "before her destination was reached, she was caused to leave the train" are consistent with allegations of the complaint, and not erroneous as a submission on instructions not in conformity to the pleadings and issues. (Page 599.)

APPEAL from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

Action by Edith P. Slatter against the Oregon Short Line Railroad Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*P. L. Williams, Geo. H. Smith, Frank K. Nebeker* and *H. B. Thompson* for appellants.

*Powers & Marioneaux* and *Ricey H. Jones* for respondent.

STRAUP, J.

The plaintiff alleged in her complaint that she was a passenger on one of the trains of the defendant, and that its agents and servants negligently ordered her off, and wrongfully ejected her from, the train at a place not a station, and before her destination was reached. A judgment was had in favor of the plaintiff, from which the defendant has prosecuted this appeal.

Its chief contention is that the court erred in refusing to direct a verdict in its favor, and in submitting the case to the jury on a theory at variance with the allegations of the complaint.

In support of the first contention, it is urged that the evidence is insufficient to show that the plaintiff was ordered off, or ejected from, the train by an agent or servant of the defendant. The plaintiff, on this point, testified in substance that at McCammon, Idaho, she purchased a ticket to Dayton, a distance of about forty miles. She boarded the train at McCammon at about four o'clock in the afternoon. She testified:

"We (she and her children) got into a day coach, which was crowded, and I did not have a seat for quite a while after I got on the train; but a gentleman left the car, and went into the smoker, and gave me his seat. One of the trainmen came and called for tickets, and I handed him mine. I had no conversation with him at all. The train went quite a distance and then slowed up, and one of the trainmen came through the door. I looked to see what the train was slowing up for. He said, 'This is your place to get off.' I immediately got up, gathered up the baggage and the little

girls, and went to the platform; the little girls going first. When I got to the platform, we were not at any station; there were no buildings at all there. I asked the man if he would please back the train to the station, as I was an invalid, and had not walked that far for several months. He said that he could not do that; that I had already held the train too long, and I must get off at once. He helped the children down and the baggage. Then he got hold of my arm and assisted me down from the platform to the ground. The weather was cloudy, a drizzling rain. The train went on, and I picked up the baggage, and the little girls started to carry the suit case, and I started with the wraps, and we started back towards the station. There was no house right close that I noticed, and no walks, only the roadbed. . . . When we got back to the station, I saw it was Garner. I went to the agent and got him to telegraph about my baggage, and asked him the time of the next train. I remained in the station two or three hours, until the next train came, which I think was something after seven o'clock. It was nearly dark when we arrived at Dayton. There was no agent at Dayton, and the station was closed."

On cross-examination she testified: "After I had gotten on the train and was seated, some one in uniform came along and took up my ticket. I don't know whether he was a conductor, or brakeman, or what. I noticed that there were letters on his cap, but I could not say what they were. I was seated in an ordinary day coach. I did not tell him where I was to get off at. I simply presented the ticket, and he took it. . . . I don't know who it was that came to me and said, 'That is the place for you to get off.' I would not know the man if I saw him again. I was sitting at the end of the car with my back towards the engine, facing the rear of the car. The gentleman came to the doorway and told me, 'This is your place to get off.' . . . Q. How do you know he was a trainman? A. Well, he had on a uniform. Q. What do you mean by a uniform? A. He had blue clothes with, it seemed to me, brass buttons on it; a cap with writing across here, one with those pokes on. He

had metal buttons on his coat. I don't know whether they were brass or silver color. I don't know the difference in dress between the conductor and brakeman."

In response to questions, she further testified: "I have noticed that the news agent, the excursion agent, the tourist agent, all wear blue clothes on that road, too, a little differently made. It is dark blue cloth, the same color as the others, with metal buttons, sometimes silver, sometimes brass, with a cap with letters on. Sometimes it says 'tourist agent;' sometimes 'advertising agent'; sometimes it says 'news agent' on it; whichever it is. I have noticed that, and this man may have been one of all these, from all I could tell from any lettering on his cap, or any particular feature of his dress. I did not take that much notice of him at all. . . . I call him a trainman. He had a uniform, had a cap, and I concluded he was a brakeman or conductor. He did not put his hand on me, or anything of that kind. He was not close enough for that. He did not come in the car. He was standing on the platform. When I came out, he was going down the steps. I did not notice whether he had blue eyes, or whether he was a smooth-faced man. Nothing about his size attracted my attention one way or the other."

The members of the train crew testified that they had no knowledge of whether plaintiff was a passenger on the train, whether she left it at Garner or elsewhere, nor of the circumstances of her getting off or leaving it, and testified that they did not tell nor assist her to get off at Garner. The conductor of the second train testified that he carried plaintiff from Garner to Dayton, as testified to by her.

We think this evidence is sufficient to require a submission of the case to the jury for their finding on the question complained of.

The complaint, though somewhat lengthy and a commingling of evidentiary and ultimate facts, yet contains the averments that the plaintiff purchased a ticket from the defendant, entitling her to ride from McCammon to Dayton; that she boarded the defendant's train at McCammon; that the conductor of the train took

up her ticket, and that before the train reached Dayton "the said defendant by its servants and agents refused to carry the plaintiff further, and stopped said train, but not at any station, and in a rude, uncivil, and abusive manner accosted plaintiff and ordered her off said train and upon her refusal, wilfully, and grossly neglectful of its duties, and with a high hand and reckless disregard of the rights, health, and safety of the said plaintiff and her two children, wrongfully, and wantonly ejected them and their hand baggage from said train, well knowing that the plaintiff was an invalid," etc.

The court, among other instructions, charged the jury: "If the jury find from the evidence that on the 15th day of August, 1909, the plaintiff purchased of the defendant, at its station at McCammon, Idaho, a railroad ticket from Mc-Cammon, in the state of Idaho, to Dayton, in the state of Idaho, and entered upon defendant's train for the purpose of traveling to said station of Dayton, and surrendered her ticket to an agent of defendant on the train, then the plaintiff became a passenger, and was entitled to be transported to her destination, and to be informed by defendant when she reached her destination, and the defendant would have no right to cause her to leave its said train until she reached the point designated on the ticket."

The court also charged: "If the jury find from the evidence that the plaintiff became a passenger upon defendant's train, as she alleges, and as explained in these instructions, and that before her destination was reached she was caused to leave the train by defendant's agents or servants, then the plaintiff is entitled to recover."

Again the court charged: "The court instructs the jury that, if the plaintiff was accepted as a passenger of defendant and surrendered her ticket to one of the defendant's employees, and before reaching her station she was caused to alight from the train, as she claims, and was not informed by defendant's servants that the train had not arrived at her destination, then the plaintiff is entitled to recover such damages as will compensate her for such in-

juries, if any is shown by the evidence, as was the natural and proximate result of defendant's act."

These instructions are pointed to as being on a theory at variance with the allegations of the complaint. In support of it, it is urged that in the complaint it is alleged that the agents of the defendant "refused to carry plaintiff further," that they, "in a rude and uncivil manner, accosted her," and that they, "with a high hand and reckless disregard of her rights, ejected her," and that the court, instead of submitting the case to the jury on such allegations, submitted it to the jury on the theory of whether the plaintiff, "before reaching her station, was caused to alight from the train" by the defendant's agents, "as she claims," whether she was a·passenger on the train, as alleged, and as explained by the instructions, and whether, "before her destination was reached, she was caused to leave the train by the defendant's agents or servants." Hence we are told that the expressions in the charge, "was caused to alight from" and "leave the train," were not equivalent to the allegations of ejectment, and that they constitute a variance. Then we are referred to a long list of cases holding that a "recovery cannot be had on proof of other acts of negligence than the specific acts alleged in the complaint." The expressions and statements of the charge refer to and describe the same, not different, acts and conduct alleged in the complaint, and are consistent, not inconsistent, with the material and essential allegations thereof. The allegations that the agents of the defendant "accosted" the plaintiff and ejected her in an "uncivil manner," and "with a high hand and a reckless disregard of her rights," are mere verbiage and non-essentials, to which counsel attach too much importance.

The judgment of the court below should be, and therefore is, affirmed, with costs.

FRICK, C. J., and McCARTY, J., concur.